UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| PATRICK FERRY, individually and as successor and executor to the Estate of Randy Sapp, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>DE LONGHI AMERICA INC., et al,<br><br>Defendants. | Case No: C 16-00659 SBA<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT OF PLAINTIFF PATRICK FERRY'S WRONGFUL DEATH CLAIM**<br><br>Dkt. 58 |

Plaintiffs Patrick Ferry ("Mr. Ferry")—individually and as successor and executor to the Estate of Randy Sapp ("Mr. Sapp")—Brenda Gonzales, Don Sapp, and Sharon Cornelius (collectively, "Plaintiffs") bring the instant personal injury and wrongful death action against Defendants De'Longhi America Inc. and De'Longhi S.p.A. (collectively "De'Longhi"). The action arises out of a residential fire caused by a purportedly defective heater that De'Longhi manufactured and distributed. The fire resulted in Mr. Sapp's death and injuries to Mr. Ferry. The parties are presently before the Court on De'Longhi's Motion for Partial Summary Judgment of Plaintiff Patrick Ferry's Wrongful Death Claim. Dkt. 58. Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby GRANTS the motion, for the reasons stated below. The Court, in its discretion, finds this matter suitable for resolution without oral argument. See Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

# I. BACKGROUND

## A. MR. FERRY AND MR. SAPP'S RELATIONSHIP

Mr. Ferry was Mr. Sapp's "domestic partner, business partner, and beneficiary." First Am. Compl. ("FAC") ¶ 3, Dkt. 36. Messrs. Ferry and Sapp met in or about May 1984 and began living together in or about August 1985. Decl. of Pl. Patrick Ferry in Opp'n to Partial Mot. for Summ. J. ("Ferry Decl.") ¶ 2, Dkt. 61-1. Messrs. Ferry and Sapp never separated or lived apart until the date of Mr. Sapp's death on December 26, 2013. Id.

On March 6, 1993, Messrs. Ferry and Sapp "were married in a religious ceremony performed by a religious leader pursuant to the principles of [their] beliefs . . . at the First Unitarian Church of San Francisco." Id. ¶ 3. "Had it been possible to do so," they "would have obtained a marriage license." Id. At that time, however, same sex marriage was not legal. After the ceremony, Messrs. Ferry and Sapp held themselves out as a married couple. Id. ¶ 5. They "shared everything," including personal and business assets, and named each other as sole beneficiaries of their respective estates. Id. ¶ 6.

Although Mr. Ferry "recognized" that the marriage "was not viewed under the law as 'legal,'" he and Mr. Sapp "always viewed it as absolutely valid and binding." Id. ¶ 7. They "believed that any prohibition of same-sex marriage . . . was discriminatory and unconstitutional." Id. Messrs. Ferry and Sapp never registered as domestic partners, in part because they "held most firmly" that their marriage was already valid. Id. "It was [Mr. Ferry's] personal belief that [their] marriage was valid because the laws providing otherwise were both invalid and unconstitutional." Id. In June 2013, after the Supreme Court affirmed the decision striking down the ban on same-sex marriage, Messrs. Ferry and Sapp "felt that [their] position on the issue of whether [they] had, in fact, been married had been vindicated." Id. ¶ 8. The ruling "confirmed" their long held belief that they were "legally married." Id. Thus, they "did not believe" there was any reason to 'remarry.'" Id.

## B. THE FIRE AND INJURIES

On December 25, 2013, Mr. Sapp was in bed when a purportedly defective De'Longhi heater caught fire. FAC ¶ 23. Mr. Sapp was initially disoriented as flames

quickly engulfed the bedroom.  Id.  Mr. Ferry called out to Mr. Sapp, who followed Mr. Ferry's voice out into the hallway.  Id. ¶ 24.  Mr. Ferry tackled Mr. Sapp to the ground and partially extinguished the flames on Mr. Sapp with his own body and a hallway carpet runner.  Id.  Mr. Ferry then dragged Mr. Sapp down a flight of stairs and outside, where bystanders and arriving firemen further extinguished the flames on Mr. Sapp's body.  Id.[1]

Mr. Sapp sustained severe burn injuries that resulted in his death.  Id.  Mr. Ferry also sustained significant burns that required hospitalization, as well as emotional trauma.  Id. ¶ 25.  As a result of Mr. Sapp's death, Mr. Ferry has been deprived of his partner's care, comfort, society and household services.  Id. ¶ 26.  Additionally, the fire partially destroyed Mr. Ferry's home, resulting in property damage and loss of use.  Id.  Mr. Sapp's estate and Mr. Ferry have suffered loss of income and support from their business.  Id.  Finally, as a disabled person, Mr. Ferry has lost the primary care provider on whom he depended.  Id.

### C. THE INSTANT ACTION

On December 22, 2015, Plaintiffs initiated the instant action in the San Francisco County Superior Court.  Dkt. 1, Ex. A.  On October 24, 2016, after De'Longhi removed the action to this Court, Plaintiffs filed the operative First Amended Complaint.  Dkt. 36.  Under theories of general negligence and product liability, Plaintiffs allege causes of action for personal injury and wrongful death, including a claim for wrongful death by Mr. Ferry.

On February 24, 2017, De'Longhi filed the instant motion for partial summary judgment of Mr. Ferry's wrongful death claim.  Dkt. 58.  Mr. Ferry filed an opposition, Dkt. 61, and De'Longhi filed a reply, Dkt. 62.  The motion is ripe for adjudication.[2]

---

[1] Details regarding the purportedly defective heater are immaterial to the resolution of the instant motion.  In brief, Plaintiffs allege the heater was subject to a recall for posing a "consistent and serious fire hazard."  FAC ¶¶ 19-20.  They further allege recall efforts were inadequate, leaving approximately 3.2 of the 3.6 million heaters in use.  Id. ¶¶ 21-22.

[2] The parties initially stipulated to continue the hearing on this motion to May 10, 2017.  Dkt. 60.  Thereafter, the Court learned that the parties had failed to complete their selected ADR process.  The Court issued an order directing the parties to complete the ADR Process and holding the instant motion in abeyance pending its completion.  Dkt. 71.  A certification filed July 11, 2017, shows the parties have now completed the ADR process.  Dkt. 74.  The order holding the motion in abeyance is therefore vacated.

## II. LEGAL STANDARD

A party may move for summary judgment on some or all of the claims or defenses presented in an action. Fed. R. Civ. P. 56(a). "Summary judgment is appropriate only where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Salazar-Limon v. City of Houston, Tex., 137 S. Ct. 1277, 1280 (2017) (quoting Fed. R. Civ. P. 56(a)). The moving party bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that establish the absence of a genuine dispute of material fact. Cline v. Indus. Maint. Eng'g & Contracting Co., 200 F.3d 1223, 1229 (9th Cir. 2000) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986)). If the moving party meets its burden, the burden then shifts to the non-moving party to go beyond the pleadings and identify specific facts demonstrating the existence of a triable issue. Id. (citing Celotex, 477 U.S. at 323-24; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

In evaluating a motion for summary judgment, "the court must 'view the facts and draw reasonable inferences in the light most favorable to the [non-moving party].'" Salazar-Limon, 137 S. Ct. at 1281 (quoting Scott v. Harris, 550 U.S. 372, 378 (2007) (quotation omitted)). Facts must be viewed in this manner, however, only if there is a *genuine* dispute as to a *material* fact. Scott, 550 U.S. at 380. A factual dispute is material if it "might affect the outcome of the suit under governing law." Anderson, 447 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." Id. A factual dispute is genuine if it properly can be resolved in favor of either party. Id. at 250. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations omitted).

## III. DISCUSSION

De'Longhi argues that Mr. Ferry's wrongful death claim fails as a matter of law because he does not have standing to bring such a claim.

"In California, wrongful death actions are statutory in origin and exist only so far and in favor of such persons as the legislative power may declare." Ceja v. Rudolph &

Sletten, Inc., 56 Cal. 4th 1113, 1118 (2013) (quotation omitted). Standing to sue for wrongful death is governed by California Code of Civil Procedure section 377.60 ("section 377.60"), which provides that such an action may only be brought by a defined list of persons. Soto v. BorgWarner Morse TEC Inc., 239 Cal. App. 4th 165, 188 (2015), reh'g denied (Aug. 5, 2015), as mod. (Aug 20, 2015), rev. denied (Oct. 28, 2015) ("The right to bring a wrongful death action is limited to those persons described in . . . section 377.60."). "The category of persons eligible to bring wrongful death actions is strictly construed." Id. (citation omitted). As is pertinent here, such persons include a decedent's spouse, domestic partner, and dependent putative spouse. § 377.60(a) & (b); Ceja, 56 Cal. 4th at 1118-19. "A plaintiff seeking to bring a wrongful death claim bears the burden of pleading and proving his or her standing to do so." Soto, 239 Cal. App. 4th at 188 (citation omitted).

De'Longhi contends that Mr. Ferry did not qualify as Mr. Sapp's spouse, domestic partner, or putative spouse, and thus, lacks standing to bring a wrongful death claim.

### A. SPOUSE OR DOMESTIC PARTNER

Among those persons authorized to bring a cause of action for wrongful death is a decedent's surviving spouse or domestic partner. § 377.60(a). The term "spouse" refers to "persons who are lawfully married to each other." Cal. Fam. Code § 11. A lawful marriage "shall be licensed, solemnized, and authenticated." Id. § 306. "For the purposes of [section 377.60], 'domestic partner' means a person who, at the time of the decedent's death, was the domestic partner of the decedent in a registered domestic partnership established in accordance with subdivision (b) of Section 297 of the Family Code." § 377.60(f)(1). California Family Code section 297(b) provides: "A domestic partnership shall be established in California when both persons file a Declaration of Domestic Partnership with the Secretary of State pursuant to this division, and, at the time of filing, [five additional] requirements are met[.]"[3] Registration of a domestic partnership is a

---

[3] In brief, the additional requirements are met if: (1) neither person is married to or in a domestic partnership with someone else; (2) both persons are not related by blood; (3) both persons are at least 18 years of age; (4) both persons are members of the same sex; and (5) both persons are capable of consenting. Cal. Fam. Code § 297(b).

prerequisite to a surviving partner's standing to sue for the other's wrongful death. Armijo v. Miles, 127 Cal. App. 4th 1405, 1414 (2005) (citing Holguin v. Flores, 122 Cal. App. 4th 428, 434-37 (2004) (same)).[4]

De'Longhi argues that Mr. Ferry lacks standing to bring a wrongful death claim because he and Mr. Sapp were neither lawful spouses nor registered domestic partners. Mr. Ferry admits that he and Mr. Sapp never registered as domestic partners. Ferry Decl. ¶ 7 ("we did not register as domestic partners"). He further admits that he and Mr. Sapp never legally married. Id. ("I recognized that our marriage was not viewed under the law as 'legal' . . ."). Nevertheless, Mr. Ferry contends that judicial decisions recognizing the constitutional right of same-sex couples to marry "should be retroactively applied to render [his and Mr. Sapp's] marriage valid." Opp'n at 5. According to Mr. Ferry, his marriage is valid because the laws that precluded him from marrying in 1993 were discriminatory and unconstitutional. De'Longhi refutes this contention, arguing that Mr. Ferry "conflates the right to marry with being legally married in the eyes of the state." Reply at 3.

### 1. A Brief History of Same-Sex Marriage Rights in California

It is undisputed that California did not legally recognize same-sex marriage or domestic partnership at the time Messrs. Ferry and Sapp wed in 1993. In 1999, California enacted legislation to create a statewide domestic partnership registry. See In re Marriage Cases, 43 Cal. 4th 757, 801 (2008). Thereafter, over the course of several years, California gradually expanded the rights of registered domestic partners to afford same-sex couples "virtually all of the legal benefits, privileges, responsibilities, and duties" afforded to married opposite-sex couples. Id. The two institutions—marriage and domestic partnership—remained separate and distinct, however.

In 2008, the California Supreme Court held that the state Constitution guarantees same-sex couples the right to marry and that state laws limiting the designation of marriage

---

[4] An exception to the registration requirement exists for deaths occurring prior to January 1, 2002, when the right of a domestic partner to file a wrongful death claim went into effect. See § 377.60(f)(2); Armijo, 127 Cal. App. 4th at 1413-14.

to a union "between a man and a woman" are unconstitutional. Id. at 829, 855-56. In so holding, the Court rejected the notion that "affording same-sex couples access only to the separate institution of domestic partnership" satisfies that constitutional right. Id. at 845. The Court reasoned that the separate designation of domestic partnership fails to accord same-sex couples the respect and dignity accorded opposite-sex couples. Id.

Shortly thereafter, in November 2008, a voter-enacted amendment to the California Constitution (commonly referred to as "Proposition 8") again limited marriage to a union between a man and a woman. See Perry v. Schwarzenegger, 704 F. Supp. 2d 921, 927 (N.D. Cal. 2010) (citing Cal. Const. Art. 1, § 7.5). Proposition 8 was immediately challenged and struck down as unconstitutional. Id. at 1003. An appeal wound its way through the Ninth Circuit, the California Supreme Court, the Ninth Circuit again, and ultimately the United States Supreme Court, which held that the petitioners lacked standing to challenge the district's court decision. Hollingsworth v. Perry, 133 S. Ct. 2652, 2668 (2013) (remanding with instructions to dismiss the appeal for lack of jurisdiction). The district court's decision was thereby finalized, rendering same-sex marriage legal in California as of June 2013. See Perry v. Brown, 725 F.3d 968, 970 (9th Cir. 2013) (dissolving the stay of the district court's order enjoining enforcement of Proposition 8).

Two years later, in June 2015, the United States Supreme Court held that the federal Constitution affords same-sex couples a right to marry that may not be denied. Obergefell v. Hodges, 135 S. Ct. 2584, 2604-05 (2015). The Court therefore struck down certain state laws to the extent that they "excluded same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples." Id. at 2584.

### 2. Mr. Ferry's Arguments

Mr. Ferry argues that he "should be given the benefit of the long-awaited conclusions reached in In re Marriage Cases, Perry, and Obergefell." Opp'n at 8. In support of this argument, he relies on the general principle that judicial decisions are given retroactive effect. Id. (citing Lazarin v. Super. Ct., 188 Cal. App. 4th 1560, 1581 (2010) ("Unlike statutes . . . judicial decisions are generally given retroactive effect.") (citation

omitted)). He asserts that retroactive application of the aforementioned cases "mandate recognition of [his] marriage as valid because his inability to obtain a marriage license was the result of unconstitutional statutes that precluded him from doing so." Id. at 9.

Mr. Ferry further argues that the fact that he and Mr. Sapp "never obtained a marriage license issued by a government entity" should not alter the analysis. Id. He asserts that it "would be manifestly unfair to bar [him] from obtaining the benefits of the married state, including his standing to sue for the wrongful death of his husband, where a discriminatory and unconstitutional law *precluded* him from obtaining a marriage license." Id. at 10-11 (emphasis in original). Given that he and Mr. Sapp would have obtained a marriage license had they been able to do so in 1993, Mr. Ferry argues, "the Court should put [him] in the same place that he would have been had the unconstitutional ban against marriage by same-sex couples never existed." Id. at 11. As support, Mr. Ferry relies on extra-jurisdictional decisions that have extended the rights of married persons to unmarried same-sex couples who would have married if not precluded from doing so.

### 3. Analysis

Upon careful consideration, Mr. Ferry's arguments prove unpersuasive. Although Mr. Ferry urges the retroactive application of Perry and Obergefell, the Court finds that the facts of this case do not implicate a retroactivity issue. These decisions—particularly Perry—established that same-sex couples have a constitutional right to marry in California and invalidated state laws that infringed upon the exercise of that right. Although Perry afforded same-sex couples the right to marry as of June 2013, it is undisputed that Messrs. Ferry and Sapp did not obtain a marriage license or otherwise take steps to legalize their marriage. Thus, they were not lawfully married at the time of Mr. Sapp's death. The authorities upon which Mr. Ferry relies underscore the importance of this point.

In Mueller v. Tepler, 312 Conn. 631, 634 (2014), the Connecticut Supreme Court considered whether a same-sex partner could maintain a spousal loss of consortium claim, even though the couple was unmarried when the underlying tort occurred, on the ground that they "would have been married" if not barred under then-existing state law. The Court

held that under such circumstances, a same-sex partner can maintain a loss of consortium claim. Id. at 649.[5] Mr. Ferry asks this Court to adopt the reasoning of Mueller, asserting that he and Mr. Sapp would have married in 1993 if it had not been barred under state law. Opp'n at 12. However, Mr. Ferry fails to recognize two key distinctions between Mueller and the instant case: (1) unlike a common law claim for loss of consortium, a cause of action for wrongful death is statutory in nature and may not be judicially expanded; and (2) at the time of the operative event—i.e., Mr. Sapp's death—California law did not preclude Messrs. Ferry and Sapp from marrying.

First, as to the nature of the right being asserted, the Connecticut Supreme Court specifically noted that Mueller concerned the expansion of "*the judicially created right* to maintain a loss of consortium claim . . . ." 312 Conn. at 660 (emphasis in original). Thus, the court was "not constrained" by the limitations that attend the expansion of "a statutory benefit." Id. (citing Charron v. Amaral, 451 Mass. 767, 773 (2008) (holding that a same-sex partner could not recover loss of consortium damages under a Massachusetts' statute for injuries suffered by her partner, even though same-sex marriage was unlawful at the time the underlying tort occurred)). Here, on the other hand, "[i]t is well settled under California law [that] recovery for wrongful death is a legislatively created right." Holguin, 122 Cal. App. 4th at 437 (citing Justus v. Atchison, 19 Cal. 3d 564, 580-81 (1977)).

"[I]n creating such a right[,] the Legislature is not required to extend it to every conceivable class of persons who might suffer injury from the death of another." Id. "The decision of the Legislature as to just how far to extend a statutorily created right of action 'is conclusive, unless it appears beyond rational doubt that an arbitrary discrimination between persons or classes similarly situated has been made without any reasonable cause therefor.'" Id. at 437-38 (quoting Justus, 19 Cal. 3d at 581 (internal quotations omitted)).

---

[5] In Mueller, the underlying tort occurred on or before March 5, 2004, the couple was joined in a civil union on or about November 12, 2005, and a medical malpractice/loss of consortium action was initiated on January 10, 2006. 312 Conn. at 635-36. Connecticut law first afforded the couple an opportunity to formalize their relationship, in the form of a civil union, on October 1, 2005. Id. n.4.

Thus, absent a constitutional basis for departure, the Court is "bound" by the statutory limitations regarding the class of persons who may bring an action for wrongful death. Garcia v. Douglas Aircraft Co., 133 Cal. App. 3d 890, 894 (1982) (quoting Steed v. Imperial Airlines, 12 Cal. 3d 115, 120 (1982)); see also, Aspinall v. McDonnell Douglas Corp., 625 F.2d 325, 328 (9th Cir. 1980) ("Appellant also urges this Court to extend the California wrongful death statute . . . on some equitable basis. While we might like to do so, our hands are tied. We cannot legislate this change in California's statute law.")

Second, contrary to Mr. Ferry's contention, the underlying rationale supporting expansion of a loss of consortium claim in Mueller does not apply here. In Mueller, the inability of the couple to marry prior to the tortious conduct was central the court's holding. The court noted that, traditionally, "a plaintiff who was not married to the injured person when the underlying tort occurred cannot maintain a loss of consortium claim." Id. at 652. That rule is "based on the presumption that, if a couple had the level of mutual commitment that customarily leads to marriage and wanted to be married before the underlying tort occurred, the couple would have been married." Id. Because the couple in Mueller "could not have been married before the date of the tortious conduct even if they had the requisite commitment and desire," the Court concluded that it was illogical and inequitable to require marriage. Id. at 652-53. Marriage cannot serve as a proxy for the strength of a couple's commitment to each other if, simply put, "marriage is not an option." Id. at 654.

"With respect to couples who *could have been married* before the underlying tort occurred," however, the Connecticut Supreme Court affirmed the existing bright line presumption based on marriage. Id. at 655 n.20 (emphasis in original) (noting that, if an unmarried couple had the option to marry, courts will "conclusively presume" that they lacked the necessary strength of commitment). The court recognized that "there may be situations in which the presumption may not reflect reality, as, for example, when a husband-to-be was injured as he proceeded down the church aisle to be married." Id. "Nevertheless, the rule's general reasonableness as applied to couples who could have married before the underlying injury occurred and its ease of application outweigh the

potential harshness of its application in outlying cases." Id. As discussed below, Mueller's rationale is persuasive but inapplicable here.

California, like Connecticut, limits an action for loss of consortium to a married spouse. Elden v. Sheldon, 46 Cal. 3d 267, 278 (1988). Likewise, California limits an action for wrongful death to a married spouse. Ledger v. Tippitt, 164 Cal. App. 3d at 632 (1985) (the plaintiff was not entitled to bring such a wrongful death action, despite the fact that she and the decedent had cohabitated, shared a child, and unsuccessfully attempted to marry in another state); Garcia, 133 Cal. App. 3d at 893 (the cohabitating fiancée of the decedent—engaged to be married eight days after his death—was not entitled to bring an action for wrongful death). This distinction between married and unmarried couples has been consistently upheld. Holguin, 122 Cal. App. 4th at 438; accord Garcia, 133 Cal. App. 3d at 895. As is pertinent here, California courts have found it reasonable to conclude that "a relationship which the parties have *chosen* not to formalize by marriage lacks the necessary permanence to allow the survivor to recover damages for wrongful death . . . ." Id. (emphasis added); accord Holguin, 122 Cal. App. 4th at 442-43.

As the foregoing analysis demonstrates, "*choice* is the key to determining whether [a statute conferring rights upon a spouse] applies to a particular same-sex couple." In re Madrone, 271 Or. App. 116, 128 (2015) (emphasis in original) (holding that same-sex partners who "*would have* chosen to marry before [a] child's birth had they been permitted to" are entitled to a statutory presumption of parentage that otherwise conferred benefits only upon a married spouse). Where marriage is unavailable, it cannot "serve as a proxy for the strength of a couples' commitment to each other." Mueller, 312 Conn. at 654. If marriage is available, however, the usual presumptions regarding marriage apply. Id. at 655 n.20; see also Holguin, 122 Cal. App. 4th at 442 (concluding that the unmarried opposite-sex plaintiffs were "not entitled to the same solicitude [as same-sex registered domestic partners] because the law did not prevent them from marrying").

Finally, as the cases extending spousal benefits to unmarried same-sex couples demonstrate, the choice to marry must have existed—not at the time a couple first would

have wed—but at the time of the operative event giving rise to the legal claim or right being advanced. See Mueller, 312 Conn. at 654-65 (allowing a same-sex partner to bring a loss of consortium claim "if he or she can prove that the couple would have been married when *the underlying tort* occurred if not for the fact that they were barred from doing so under the laws of th[e] state") (emphasis added); Madrone, 271 Or. App. at 128 (affording a statutory presumption of parentage to a same-sex partner if the couple can prove that they would have "chosen to marry before *the child's birth* had they been permitted to") (emphasis added). Indeed, California adopted the same approach when it extended the right to bring a wrongful death claim to registered domestic partners effective January 1, 2002. After so expanding the class of persons eligible to bring a wrongful death claim, the Legislature created an exception to the registration requirement for "*a death* occurring prior to January 1, 2002." § 377.60(f)(2) (emphasis added). The Legislature did not create an exception for all domestic partnerships created prior to that date.

Here, the event potentially giving rise to a wrongful death claim is Mr. Sapp's death, which occurred in December 2013. Although Messrs. Ferry and Sapp had the option to marry prior to Mr. Sapp's death, they did not do so.[6] Consequently, the Court finds that Mr. Ferry was not Mr. Sapp's lawful spouse, and thus lacks standing as such.

### B. PUTATIVE SPOUSE

In addition to a spouse or domestic partner, California confers standing to bring a wrongful death claim upon a putative spouse. § 377.60(b). "As used in this subdivision, 'putative spouse' means the surviving spouse of a void or voidable marriage who is found by the court to have believed in good faith that the marriage to the decedent was valid." Id.

---

[6] Same-sex marriage was lawfully recognized in California approximately six months prior to Mr. Sapp's death. Because Mr. Ferry explicitly states that he and Mr. Sapp had no intention to "remarry" following the legalization of same-sex marriage, see Ferry Decl. ¶ 8, the Court need not address the issue of whether a grace period, i.e., a period between the recognition of the right to obtain a marriage license and a couples' obligation to do so, might otherwise be warranted. Additionally, because marriage was available to same-sex couples at the time of Mr. Sapp's death, the Court does not address the parties' respective arguments regarding the earlier availability of domestic partnership.

De'Longhi argues that Mr. Ferry cannot rely on the putative spouse doctrine for two reasons. First, De'Longhi argues that the Court should reject application of the doctrine because section 377.60 only refers to a "putative spouse" and courts in California are split as to whether there exists an equivalent "putative domestic partner" doctrine. Second, even assuming the doctrine extends to domestic partners, De'Longhi argues that Mr. Ferry does not qualify as such because he did not hold a good faith belief that he and Mr. Sapp were in a valid marriage or domestic partnership.

### 1. Availability of the Putative Domestic Partner Doctrine

For reasons that ought to be obvious, De'Longhi's argument that the putative spouse doctrine does not extend to domestic partnerships is irrelevant. California courts divided on the issue of whether the putative spouse doctrine extends to domestic partners. Compare In re Domestic Partnership of Ellis, 162 Cal. App. 4th 1000, 1009 (2008) (extending the doctrine to domestic partners) with Velez v. Smith, 142 Cal. App. 4th 1154, 1174 (2006) (declining to extend the doctrine). However, those cases were decided before same-sex marriage became legal in California and concerned claims by professed *domestic partners* (i.e., a person who entered into a domestic partnership that appeared valid but was actually void or voidable). Mr. Ferry does not claim to have been Mr. Sapp's domestic partner; rather, he claims to have been Mr. Sapp's spouse or, alternatively, putative spouse. Given that same-sex marriage is now legal, Mr. Ferry may avail himself of the putative spouse doctrine, and need not argue for an extension of the doctrine to domestic partners.

### 2. Good Faith Belief in the Validity of the Marriage

Turning to the question of whether Mr. Ferry may qualify as a putative spouse, the Court reiterates that a putative spouse is a "surviving spouse of a void or voidable marriage who is found by the court to have believed in good faith that the marriage to the decedent was valid." § 377.60(b); Ceja, 56 Cal. 4th at 1121. "The good faith inquiry is a subjective one that focuses on the actual state of mind of the alleged putative spouse." Id. at 1128.

"While there is no requirement that the claimed belief be objectively reasonable, good faith is a relative quality and depends on all of the relevant circumstances, including

objective circumstances." Id. "In determining good faith, the trial court must consider the totality of the circumstances, including the efforts made to create a valid marriage, the alleged putative spouse's personal background and experience, and all the circumstances surrounding the marriage." Id. Thus, "the reasonableness or unreasonableness of one's belief in the face of objective circumstances pointing to a marriage's invalidity is a factor properly considered as part of the totality of the circumstances in determining whether the belief was genuinely and honestly held." Id.

According to De'Longhi, Mr. Ferry "concedes facts that are completely inapposite to any finding of putative status." Mot. at 8. As noted by De'Longhi, Mr. Ferry admits that he knew same sex marriage was not lawful at the time that he and Mr. Sapp "married." Id. at 9. Thus, "although the good faith inquiry is a subjective one," De'Longhi argues that "the evidence points to the inescapable conclusion that [Mr.] Ferry did not harbor even a subjective belief that he and the decedent were in a valid marriage . . . ." Id. Mr. Ferry responds that "the determination of subjective good faith in whatever context raises an issue of fact which must normally be determined by the jury," Opp'n at 14, and avers that he sincerely believed in the "validity" of his marriage, id. at 15-19. The flaw in Mr. Ferry's argument lies, not in the *sincerity* of his beliefs, however, but in their *substance*.

Mr. Ferry acknowledges that his marriage was facially illegitimate, but asserts that he sincerely believed the law denying him the right to marry was unconstitutional and discriminatory. Opp'n at 16 (asserting that Mr. Ferry "had a sincere and honest belief that they had a right to marry and that the technical unavailability of a marriage license was the result of an unconstitutional and discriminatory limitation forced on them"). His belief was in the validity of his *right to marry*, which the state denied. Id. at 17 (asserting that Mr. Ferry's "belief in his right to marry was a genuine, honestly-held belief"). Mr. Ferry thus attempts to turn California's putative spouse doctrine on its head, arguing that a good faith belief in "the validity of a *facially-invalid*, though *actually-valid*, marriage" supports the application of the doctrine. Id. at 15 (emphasis added). The law regarding the putative spouse doctrine does not support this view.

- 14 -

As stated above, the putative spouse doctrine protects "innocent parties who believe they were validly married." Ellis, 162 Cal. App. 4th at 1005. "[A] proper assertion of putative spouse status must rest on facts that would cause a reasonable person to harbor a good faith belief in the existence of a *lawful* California marriage." Welch v. State, 83 Cal. App. 4th 1374, 1378 (2002) (emphasis in original); In re Marriage of Vyronis, 202 Cal. App. 3d 712, 722-23 (1988) ("the requisite belief is in a *lawful* marriage, that is to say, a marriage which complies with statutory requirements") (emphasis in original); see also, Ceja, 56 Cal. 4th at 1126 ("[A] finding of whether a party's belief was genuinely held in good faith will be informed, in part, by whether that party was aware of facts that were inconsistent with a rational belief in the validity or lawfulness of a marriage."). In evaluating a party's state of mind, courts consider "whether efforts were made to create a valid marriage and whether the party was ignorant of the infirmity rendering the marriage void or voidable." Id. at 1121 (citations omitted).[7]

Here, Mr. Ferry acknowledges that he and Mr. Sapp did not obtain a marriage license. Ferry Decl. ¶ 3. Moreover, Mr. Ferry "recognized" that his marriage "was not viewed under the law as 'legal.'" Id. ¶ 7. Thus, as noted by De'Longhi, Mr. Ferry did not enter into a seemingly lawful union, only to learn that it was void or voidable. Mot. at 14. Rather, he entered into a union with knowledge that the state deemed it invalid. The putative spouse doctrine therefore does not apply. See, e.g., Morgan v. Colvin, 2016 WL2851299, at *6, n.6 (C.D. Cal., May 12, 2016) (finding the putative spouse doctrine inapplicable where "the record clearly establish[ed] that [the alleged spouses] *knew they were not legally married . . . .*") (emphasis in original). Although Mr. Ferry asserts that he also held the (subsequently vindicated) belief that the state's failure to recognize same-sex

---

[7] The terms "lawful" and "valid" are nearly synonymous in this context, and cases "tend[] to use the latter term in enunciating the doctrine." Vryonis, 202 Cal. App. 3d at 723 (citations omitted). "Although in many situations there is little practical difference between lawful and valid," the use of the latter term "may engender confusion" in some contexts. Id. (holding that the belief in a valid religious marriage is insufficient to come within the doctrine). "The putative marriage doctrine protects the expectations of innocent parties who believe they are *lawfully* married." Id. (emphasis in original) (citing Schneider v. Schneider, 183 Cal. 335, 339-40 (1920)).

marriage was unconstitutional, no California authority has ever extended putative spouse status to a person based on his or her personally held beliefs regarding the laws governing marriage. Indeed, to do so would undermine those laws. While the state has an interest in protecting persons who believe in good faith that they entered into a lawful marriage (i.e., one that complies with statutory requirements), it has no such interest in protecting persons who have entered into facially invalid marriages.

## IV. CONCLUSION

The Court does not doubt the depth of Mr. Ferry and Mr. Sapp's commitment to each other, or seek to diminish Mr. Ferry's loss. Nor is the Court blind to the vestiges of inequity that remain even after the rights of same-sex couples have been declared. Had California recognized Mr. Ferry's right to marry in 1993, he and Mr. Sapp could have lawfully wed at that time. Unfortunately, that right was not conferred (conclusively) until June 2013. That a committed same-sex couple is required to obtain a marriage license and otherwise formalize their union in the wake of Perry may appear unfair. However, the act of obtaining a marriage license is an administrative burden that all couples must bear if they wish to avail themselves of the legal rights and privileges of a formal marriage. Courts have consistently upheld California's standing requirements for wrongful death actions. Thus, although the equities might favor a different result, the Court's "hands are tied." Aspinall, 625 F.2d at 328 (noting that, although "it might like to do so," the court could not "extend the California wrongful death statute to [the plaintiff] on some equitable basis").

Accordingly, IT IS HEREBY ORDERED THAT De'Longhi's motion for partial summary judgment is GRANTED.

IT IS SO ORDERED.

Dated: 8/16/17

SAUNDRA BROWN ARMSTRONG
Senior United States District Judge